

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AAS:ICR
F. #2016R00010

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 11, 2019

<u>By ECF</u>

The Honorable Frederic Block
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     United States v. Mohamed Rafik Naji
        <u>Criminal Docket No. 16-653 (FB)</u>

Dear Judge Block:

The government respectfully submits this memorandum in advance of sentencing in the above-captioned case, which is scheduled for June 14, 2019, at 2:30 p.m., and in response to the defendant's June 9, 2019 sentencing memorandum (Def. Mem., Dkt. No. 20).  For the reasons discussed below, the government joins in the Probation Department's recommendation that the Court impose the sentence of 240 months' imprisonment recommended by the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."), as calculated in the Presentence Investigation Report ("PSR").

I.     <u>Facts</u>

A.     <u>The Defendant's Attempts to Provide Material Support to ISIS</u>

By late 2014 the defendant had become a fervent supporter of the designated foreign terrorist organization known as the Islamic State of Iraq and al-Sham ("ISIS").  On his Facebook account the defendant regularly re-posted ISIS propaganda that celebrated ISIS's war against the world, including an image of the ISIS flag next to the letters "vs." and an icon of a world map.  Violent themes and messages were common to the ISIS propaganda that the defendant chose to post on his social media accounts.  The defendant's Facebook posts included photographs of ISIS fighters carrying weapons, videos of ISIS fighters engaged in combat and links to YouTube videos with messages from ISIS leaders calling on ISIS supporters to carry out terrorist attacks against civilian and military targets in the West.  (PSR ¶ 4).

It was this violent cause that the defendant chose to join on March 16, 2015, when he boarded a plane at John F. Kennedy International Airport on the first leg of his trip to ISIS-controlled territory in Yemen.  The defendant's journey to ISIS was not an easy one.  The defendant's email messages to his girlfriend, identified in the Complaint as "Individual 1" and in the PSR and this memorandum as the "Individual," regularly discussed the hardships he endured and the dangers he faced attempting to make his way to ISIS-controlled territory.[1]

- On March 27, 2015, the defendant emailed the Individual telling her, "it's very hard to get in I'm on my 5 try its difficult mad po po military and ppl here very scared inshallah I make it m keep trying if not m have to go from somewhere else."  The statement indicates that the defendant was making his fifth attempt to reach ISIS-controlled territory and was attempting to evade police ("po po") and military forces, and that if he failed he would try to enter ISIS-controlled territory from a different location.  (PSR ¶ 9; Compl. ¶ 13, Dkt. No. 1).

- On March 29, 2015, the defendant emailed the Individual stating "we almost got killed today by army it's been 6 day we hiding n mountains trying sneak n no food no water and have 330 miles left prayers PLZZ m glad u didn't come...". On March 30, 2015, the defendant wrote to the Individual, "we went back to city rest couple day n try again." (PSR ¶ 10).

- On April 3, 2015, the defendant emailed the Individual "we can't get in." The same day the defendant sent an email attaching a photograph that depicts four men walking along a road in what appears to be a desert-like area. The men are dressed in black, carrying backpacks and one appears to be carrying a long-barreled gun. Later the same day, the defendant

---

[1]     The defendant's girlfriend, identified herein and in the PSR as the "Individual" and as "Individual 1" in the Complaint, is the author of a letter dated April 25, 2019, that the defendant submitted to the Court as Exhibit A to his sentencing memorandum in support of his request for leniency at sentencing.  (See Def. Mem. at 15; Def. Exh. A at 1-2).  The letter from the Individual claims only that the defendant is the Individual's "good friend and brother-in-law" and a "mentor" who has "guided [her] to try [her] best to stay on the right path in life, to avoid drugs, drinking, sex, stealing.  To never lie and harm others because karma will come back to get its revenge."  The Individual's letter does not disclose that the defendant and the Individual had an intimate relationship, that the defendant lived with the Individual in Staten Island after returning from Yeman, that the Individual sent thousands of dollars to the defendant in Yemen to assist him in attempting to join ISIS, or that the defendant sent the Individual numerous emails attaching ISIS propaganda videos while he was in Yemen attempting to join ISIS.  The government submits that the Individual's letter to the Court requesting leniency for the defendant, which professes that the Individual was "troubled and surprised" to learn of the defendant's offense, should be given no weight.

wrote to the Individual that he was "thinking of coming back m really really tired." (PSR ¶ 11).

- On April 4, 2015, the defendant wrote to the Individual requesting money: "Hunny 1 last favor $2 grand for plane ticket and to get back I promise I'll pay u back when I get there it's harder then I thought m tired hiding n mountains for 3 weeks it's very very hard wallah  ill explain when I get back. ☹ ☹ ☹ ☹PLZZ m sorry for being a burden wallahi I will not leave next time till I pay u in full promise." (PSR ¶ 12; Compl. ¶ 16).

- The Individual responded on April 4, 2015, and asked the defendant, "how to I send it and where".  Later, the Individual expressed continued support for the defendant: "Don't worry I lost all myself too we in this together wallah."  The defendant then instructed the Individual to wire funds via Moneygram and provided the Individual the name of the person in Yemen to whom the money should be sent.  The defendant further informed the Individual , "It's gonna take 4 days to get here driving."  Later that day, the defendant instructed Individual 1 to send the money via Western Union, rather than Moneygram.  He stated, "No do it with western union and change the name …the first guy switched up on me he's. scared".  The defendant further informed the Individual that "the first guy cancelled on me bcuz he wanted 500 to bring it here he say it risky and far."  The defendant wrote, "It's 3am here I haven't slept n days and we have trouble getting in the party to many security Guards all ova the place they kill us if they find us we travel at night and rest n day light m explain when I get there."  Individual 1 responded to express concern that the transaction would look suspicious: "OK don't email it …. I'll send it through western union will it not look suspicious since we made the mistake ?"  (PSR ¶ 12).

- Later on April 4, 2015, the defendant responded and instructed the Individual to "PLZZ erase all ur messages."  The Individual responded, "U too."  The defendant wrote, "I do erase them even from your trash." The Individual responded "I kno". (PSR ¶ 12).

- On April 15, 2015, the Individual sent an email to the defendant asking, "U ok?"  The defendant responded by attaching a photograph of himself wearing all black clothing, including a tactical vest in which a large knife handle is visible.  The lower half of the defendant's face is covered by a black and gray bandana. (PSR ¶ 13).

- On April 21, 2015, the defendant emailed the Individual.  The subject line of the email is "First day on the job".  The email attaches a video

3

file in which gunshots are audible and the defendant's voice can be heard stating in sum, substance and in part, "I think we're taking fire," "Where it's coming from, I don't know," and "stay down".  On April 22, 2015, the defendant sent the Individual a second video file in which gunfire is audible.  (PSR ¶ 15).

- On May 1, 2015, the Individual wrote to the defendant and asked, "Was it good that I didn't go?"  On May 2, 2015, the defendant responded, "It's good and it's bad no electricity no wifi on certain areas and u need lot money to get around and becareful who u talk to bcuz u end up dead lotta spy's".  (PSR ¶ 17).

But even as the defendant faced danger and endured hardship in his efforts to join ISIS in Yemen, he remained committed to ISIS's murderous cause.  In numerous emails from the defendant to the Individual while he was in Yemen, the defendant continued to promote ISIS propaganda.  For example, on April 20, 2015, the defendant attached an ISIS propaganda video to an email he sent the Individual.  The video depicts a group of ISIS fighters with an ISIS flag sitting with an ISIS leader identified in subtitles as "Commander Abu Usamah Al-Maghribi (Rahimahullah)" who sings a verse from the Quran relating to the need to prioritize the afterlife above worldly desires.  The Individual replied to the defendant's email: "I know ☺😂☺."  (PSR ¶ 14).  Notably, the next day, the defendant sent the Individual the "First day on the job" email and video discussed above.

In another email to the Individual dated April 28, 2015, the defendant sent a screenshot of his Facebook profile under the pseudonym "Abuyousef Al-muhager" which featured a background image of an ISIS flag contrasted with a collage of flags from around the world, and which featured a profile photograph depicting what appears to be a black clad suicide bomber with an explosive device.  In the body of the email, the defendant told the Individual "U can follow up in my Facebook."  (PSR ¶ 16).

On June 24,2015, the defendant emailed the Individual with the subject line "Re: Have patience." The body of the email had an image of a man carrying what appeared to be an automatic rifle and a quote attributed to "Awlaki Quotes," the now-deceased, American-born Islamic lecturer and al-Qaeda in the Arabian Peninsula leader who espoused violent jihad against Westerners and encouraged the emigration of foreign fighters to countries around the world to engage in violent jihad.  (PSR ¶ 20).

Later, on July 24, 2015, the defendant sent the Individual an email which attached another ISIS propaganda video titled "A MESSAGE TO USA ALLIES."  In the video, which features scenes of a medieval Arab army attacking a medieval crusader castle, as well as modern-day armed ISIS fighters marching with ISIS flags, a narrator speaking Arabic threatens the United States and its allies.  The English subtitles in the video state:

O America, O allies of America, and O crusaders, know that the matter is more dangerous than you have imagined and greater than you have envisioned

We have warned you that today we are in a new era, an era where the State, its soldiers, and its sons are leaders not slaves

They are a people who through the ages have not known defeat. The outcome of their battles is concluded before they begin.

They have not prepared for a battle since the time of Noah except with absolute conviction of victory.  Being killed – according to their account – is a victory.

This is where the secret lies.  You fight a people who can never be defeated[.] They either gain victory or are killed .

And O crusaders, you are losers in both outcomes, because you are ignorant of the reality that none of us is killed but to resurrect the dead amongst us.

> B.     The Defendant's Continued Support for ISIS Following His Return to the United States

Not long before returning to the United States in September 2015, the defendant began communicating through Facebook with an individual the defendant believed to be an ISIS supporter, but who, unbeknownst to the defendant, was a confidential source of information for the government (the "CHS").  The defendant's communications with the CHS, first over Facebook and later in several in-person meetings, demonstrate not only that his ordeal in Yemen had not weakened his support for ISIS, but that he continued to support ISIS and sought to aid its cause by counseling others on how they could travel to join ISIS.

On August 26, 2015, the CHS used Facebook to ask the defendant if he was in Syria, which resulted in the following exchange:

> Defendant:    Y u wanna come over
>
> CHS:          To you ?  I want to find out a safe way
>
> Defendant:    No to dawlat islam

In this context "dawlat isalm" means the "Islamic State."  (PSR ¶ 24; Compl. ¶ 35).  Later in the same conversation, the defendant and the CHS exchanged the following messages:

> Defendant:    Ok go to hadramout they have dawlat islam there
>
> CHS:          I'm not in Yemen I'm in New Jersey

> Defendant:     It's now good to day where u are Facebook is being monitored

The defendant's instruction that the CHS should go to "hadramout" reflects an instruction that the CHS could join ISIS if he traveled to the southern region of Yemen called Hadhramaut.  In the last message the defendant appeared to intend to type "it is not good to say where you are," and later in the same conversation the defendant warned the CHS to "make sure u don't facebook with your real info," reflecting the defendant's concern that his communications regarding ISIS were being monitored by law enforcement.  (PSR ¶ 24; Compl. ¶¶ 35-36).

During the same August 26, 2015 exchange with the CHS, the defendant made clear that his loyalty remained with ISIS, telling the CHS "I belong to Islamic state only" and comparing ISIS to a "virus" because "they," "the kuffar," a derogatory term for "non-believers," "can't stop it no matter what."  (PSR ¶ 24; Compl. ¶¶ 37-38).

The defendant returned to the United States on September 12, 2015.  (PSR ¶ 25). Following his return, the defendant met repeatedly with the CHS in person.  In a December 15, 2015, conversation the defendant and the CHS discussed how to travel to ISIS-controlled territory.

> CHS:           Syria, is it easy for someone to go to the Islamic State in Syria?
>
> Defendant:     Well, as I told you last time I was already in Turkey
>
> CHS:           So you went to Turkey?
>
> Defendant:     Yeah, I was in Turkey and then traveled from there

The defendant went on to explain to the CHS that he originally planned to go to Turkey with his wife because "if she came with me it would be easy for both of us to enter . . .," adding that "if you go as a single man or if they suspect you in Turkey, they will stop you in Turkey right there before you get out of their airport."  In his conversations with the CHS, the defendant identified the Individual as the defendant's wife. This is consistent with the email communications between the defendant and the Individual described above in which the defendant and the Individual discuss whether the Individual should have travelled with the defendant to Yemen.  (PSR ¶ 26; Compl. ¶ 43).

During the same December 15, 2015 conversation, the CHS asked the defendant about how one could get to the "Islamic State" and the defendant responded, "Syria is bordering with Turkey.  Turkey is bordering Iraq and Syria.  You can enter from Turkey to Syria and you can enter from Turkey to Mosul in Iraq, you understand?"  The defendant and the CHS also discussed traveling together to join ISIS and the advantages of taking different routes into ISIS-controlled territory:

| | |
|---|---|
| Defendant: | We can go to Sinai, we can go to Libya, we can go to Yemen, we can go to Somalia, and you know what I mean |
| CHS: | Yeah |
| Defendant: | They will not suspect us like they are suspecting uh . . . |
| CHS: | Turkey |
| Defendant: | focusing on that … |
| CHS: | When you reach there … |
| Defendant: | It is easy for us to get in to anyone of those except that, look if two now go, let's say Yemenis… |
| CHS: | Or any other people who want to go |
| Defendant: | They are now focusing on things you wear, even on the shoes you wear, the focus on it, I mean don't wear boots, you understand, so don't wear boots and don't… |
| CHS: | Why what happens if you wear boots? |
| Defendant: | They will know what you are planning at. They even search your clothes piece by piece. |
| CHS: | That is tiresome |
| Defendant: | But you know what, they already made it easy for us, we can say we are traveling to Yemen.  You know like like … |
| CHS: | but Yemen, Yemen has not yet been proclaimed as a state . . . |
| Defendant: | They have proclaimed it so long time ago, before eight or nine months… |

In context, the defendant's statement "they have proclaimed it" refers to ISIS's public claim that Yemen was part of its territory for "eight or nine months" before the defendant's December 15, 2015 conversation with the CHS.  (PSR ¶ 26; Compl. ¶¶ 44-45).

Over numerous recorded conversations with the CHS, the defendant showed the CHS ISIS propaganda videos and celebrated ISIS's murderous attacks against civilians in Western countries.  For example, on July 14, 2016, an ISIS supporter drove a large truck into crowds of people celebrating Bastille Day on the Promenade des Anglais in Nice, France, murdering 86 people and injuring 458 others.  ISIS later claimed responsibility for the attack, stating that the terrorist who carried out the attack had been inspired by ISIS's call to its supporters to attack civilians in Western countries.  In a discussion with the CHS on July 19, 2016, the defendant celebrated the Nice attack and discussed his belief that ISIS wanted its supporters to carry out a similar attack in Times Square:

CHS:    I followed it from the beginning, apparently you were sleeping.

Defendant:    Yeah I was sleeping but it said that he crushed them quickly.

CHS:    I followed it from the first moment - -

. . .

CHS:    but he was shooting at the same time?

Defendant:    No he only had one pistol and cops rushed and killed him. I was saying if there is a truck, I mean a garbage truck and one drives it there to Times Square and crushes them shshshshshsh . . . Times Square day.

CHS:    Times Square

Defendant:    They want an operation in Times Square.

CHS:    Mm?

Defendant:    They want an operation in Times Square, reconnaissance group already put out a scene, the Islamic State already put up scenes of Times Square, you understand. I said that was an indication for whoever is smart to know.

CHS:    Who will do it?

Defendant:    Allah's people, the Islamic State has uh - -

8

| | | |
|---|---|---|
| CHS: | But I am following the news of the Islamic State on Facebook, my brother there has been a campaign on all of its sites- - | |
| NAJI: | I mean they have many who hate them | |

(PSR ¶ 27; Compl. ¶¶ 46-47).

Special Agents of the Federal Bureau of Investigation arrested the defendant at his apartment in Brooklyn on November 21, 2016. (PSR ¶ 28). On December 20, 2016, a grand jury in this district returned an indictment charging the defendant with one count of attempt to provide material support and resources, namely personnel, to ISIS, in violation of 18 U.S.C. §§ 2339B(a)(1) and 2339B(d). (Indictment, Dkt. No. 9).

On February 16, 2018, the defendant pleaded guilty pursuant to a plea agreement to the sole count of the indictment. (PSR ¶ 1). Pursuant to his plea agreement, the defendant stipulated and allocuted that he engaged in conduct amounting to substantial steps toward the commission of a violation of 18 U.S.C. § 2339B after June 2, 2015, the effective date of a legislative amendment increasing the statutory maximum sentence for a violation of § 2339B(a)(1) to 20 years' imprisonment. (Plea Agreement ¶ 1; Plea Tr. 25:7-18).

## II.    The Advisory Guidelines Sentence

The government submits that the Guidelines calculation below, which is the same as the Guidelines calculation in the PSR and the Guidelines calculation that the defendant stipulated to as part of his plea agreement, should be applied:

| | |
|---|---|
| Base Offense Level (§ 2M5.3(a)) | 26 |
| Plus: Offense involved the provision of material support and resource with the intent that they be used to commit or assist in the commission of a violent act (§ 2M5.3(b)(1)(E)) | +2 |
| Plus: Terrorism Enhancement (§ 3A1.4(a)) | +12 |
| Plus: Obstruction of Justice (§ 3C1.1)[2] | +2 |

---

[2]    As detailed above, the defendant obstructed justice by instructing the Individual to delete any email message exchanges with him while he was in Yemen attempting to join ISIS. The defendant also instructed the CHS to not use his true name when registering a Facebook account and to not reveal his location. The purpose of these instructions was to hinder law enforcement's efforts to obtain evidence of the defendant's material support offenses. Although the applicability of the obstruction enhancement ordinarily precludes the application of a reduction for acceptance of responsibility, the government agrees that on the

Less: Acceptance of responsibility (§ 3E1.1(a))          -2

Less: Acceptance of responsibility (§ 3E1.1(b))          <u>-1</u>

    Total:          <u>39</u>

The total offense level is 39.  (PSR ¶¶ 28-31, 33-42).  Based upon the defendant's Criminal History Category of VI, the advisory Guidelines sentencing range is 360 months' to life imprisonment.  (PSR ¶¶ 45, 75).  Because the statutory maximum sentence for the defendant's offense of conviction is 240 months' imprisonment, however, the applicable Guidelines sentence is 240 months' imprisonment.  (PSR ¶¶ 74-75).  Notably, the defendant stipulated as part of his plea agreement to this same Guidelines calculation.  (Plea Agreement ¶ 2).

    While the defendant has already conceded that the applicable Guidelines sentence is 240 months' imprisonment, he argues, without citing any authority, that his offense level and Criminal History Category are overstated as a result of the application of the terrorism enhancement pursuant to U.S.S.G. § 3A1.4(a). (Def. Mem. at 4, 14).  The argument is without merit. In 1994, Congress mandated that the Sentencing Commission establish a Guidelines enhancement for terrorism offenses to ensure that those convicted of such crimes receive punishment commensurate with the extraordinary nature of their conduct. See United States v. Stewart, 590 F.3d 93, 172 (2d Cir. 2009) (citing Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 120004, 108 Stat. 1796, 2022). The resulting terrorism enhancement at U.S.S.G. § 3A1.4(a) reflects Congress's intent that individuals convicted of terrorism offenses, like the defendant, serve sentences that are appropriate in light of the extreme dangerousness of their crimes and the unique risk of recidivism that they present.  As Judge Walker explained in his concurrence in Stewart:

> The import of this enhancement "could not be clearer": It reflects Congress' and the Commission's policy judgment "that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."

Id. at 172-73 (quoting United States v. Meskini, 319 F.3d 88, 91-92 (2d Cir. 2003)).  As the Second Circuit explained in Meskini, "even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."  Meskini, 319 F.3d at 92.

---

facts of this case the defendant's timely guilty plea before the beginning of pretrial litigation and the defendant's waiver of further discovery makes this the extraordinary case contemplated in the Guidelines commentary in which both an enhancement under § 3C1.1 and a reduction pursuant to § 3E1.1 are warranted.  (PSR ¶¶ 29-31).

Application of the terrorism enhancement to the defendant appropriately reflects the seriousness of the conduct in this case. As set forth above, the defendant devoted himself to a violent terrorist organization responsible for the murders of American civilians and soldiers, and then tried to join its ranks and advance its cause in combat overseas.  Providing material support and resources—in this case, personnel—to a dangerous foreign terrorist organization is a quintessential terrorism offense of the utmost seriousness.  Such conduct falls squarely within the class of dangerous activity that Congress has deemed worthy of significant punishment through the application of the terrorism enhancement, and the Guidelines do not overstate the seriousness of the defendant's conduct.

Nor is the enhancement's impact on the defendant's Criminal History Category inappropriate, as the defense suggests.  Rather, the effect of the terrorism enhancement on the applicable Criminal History Category reflects the Sentencing Commission's assessment of the high likelihood of recidivism, and the corresponding need for deterrence, in terrorism cases such as this one—an assessment the Second Circuit has endorsed. See Stewart, 590 F.3d at 143 (citing Meskini, 319 F.3d at 92).

In sum, application of the terrorism enhancement is entirely appropriate, and it is undisputed that the Guidelines call for a sentence of 240 months' imprisonment. (See PSR ¶ 75). The Probation Department recommends that the Court sentence the defendant to 240 months' imprisonment as prescribed by the Guidelines. (Probation Sent. Rec. at 1). As explained below, the statutory sentencing factors, see 18 U.S.C. § 3553(a), also call for the imposition of a Guidelines sentence of 240 months' imprisonment.

III.     The Section 3553(a) Factors

In addition to the sentence recommended by the Guidelines, 18 U.S.C. § 3553(a) requires the Court to consider a number of factors in imposing sentence, including (the nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1)); the need for the sentence to reflect the seriousness of the violation, to promote respect for the law, and to provide a just punishment for the violation (§ 3553(a)(2)(A)); the need for the sentence to afford adequate deterrence to criminal conduct (§ 3553(a)(2)(B)), the need to protect the public from further crimes or violations of the defendant (§ 3553(a)(2)(C)), and the need to avoid unwarranted sentence disparities among similarly situated defendants (§ 3553(a)(6)).

In this case, the sentence imposed must reflect the seriousness of the defendant's conduct, protect the public from further crimes of the defendant, deter others from traveling to

join ISIS, and promote respect for the law.  These factors all counsel in favor of a Guidelines sentence.

> A.      The Nature and Seriousness of the Defendant's Conduct, the Need for Just Punishment and the Need to Protect the Public From the Defendant Warrant a Guidelines Sentence

The defendant's conduct is undeniably serious: he traveled to Yemen in an attempt to join ISIS and wage violent jihad.  The defendant's own communications demonstrate that his journey to ISIS was not an easy one.  Once on the ground in Yemen, the defendant was in a war zone, attempting to dodge police and military forces to get to ISIS-controlled territory.  The defendant hid in the mountains and stayed low to the ground when he was near gunfire.  He had to remain wary of possible spies who could turn him in, and the defendant was constantly afraid that law enforcement and intelligence agencies would read his email messages with his girlfriend back in the United States if they were not careful about deleting them.  Still, however, the defendant persisted in his efforts to join ISIS.

In his sentencing memorandum, the defendant suggests that his conduct is somehow less serious and that he is less dangerous because he pleaded guilty to an attempt to join ISIS, and has not been convicted of the completed offense, arguing that he "talk[ed] a good game – but accomplish[ed] nothing."  (Def. Mem. at 5).  To the contrary, the fact that the defendant remained enthusiastic about ISIS's violent ideology even after the ordeal he faced attempting to travel through a Yemeni war zone to ISIS-controlled territory indicates that the defendant is among the most serious offenders to violate the material support statute.

As the Court considers the need to protect the public from further crimes of the defendant, it is particularly concerning that the dangers the defendant faced in Yemen did not dampen his enthusiasm for ISIS's violent ideology.  While taking cover from gunfire and hiding from the police, military and spies in Yemen, the defendant continued to send ISIS propaganda to his girlfriend.  Even after returning to the safety and relative comfort of the United States,  the defendant encouraged the CHS to join ISIS, giving advice about routes into ISIS-controlled territory and ways to conceal his intentions from law enforcement authorities, including by traveling with a female companion and not wearing clothes more suited to combat, such as boots.  When ISIS inspired terrorists in France carried out a deadly truck attack that killed scores of innocent civilians, the defendant celebrated and darkly referred to "indication[s] for whoever is smart to know" that ISIS reconnaissance teams had called for a similar atrocity against innocent civilians in Times Square.

Taken together, the circumstances of the defendant's offense make clear that he is a committed adherent to ISIS's murderous cause and that a Guidelines sentence is necessary both to provide just punishment for this serious offense and to protect the public from further crimes of this defendant.

B.      A Guidelines Sentence Will Avoid Creating Unwarranted Sentence Disparities

In his sentencing memorandum, the defendant advocates a sentence of ten years or less, largely in light of sentences imposed in other jurisdictions for individuals who, like the defendant, attempted to travel overseas to join a designated foreign terrorist organization. (Def. Mem. at 5-14).

The Second Circuit has long recognized that sentencing judges are vested with broad discretion in fashioning an appropriate sentence and that the broad "range of permissible decisions" available to the sentencing court frequently admits of more than one reasonable sentence. United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted). Thus, the fact that the defendant has been able to identify sentences for material support offenses that are scattered along that broad range of permissible sentences is neither surprising nor dispositive of the appropriate sentence for this defendant. Far more important to this Court's sentencing judgment than the individualized decisions that other courts made in sentencing the defendants before them, is this Court's own individualized assessment of the defendant and his conduct. The government respectfully submits that, as set forth above, the Court should use the defendant's advisory Guidelines sentence as the "starting point and the initial benchmark," Gall v. United States, 552 U.S. 38, 49 (2007), consider all of the § 3553(a) factors applicable to the defendant, and then "make an individualized assessment based on the facts presented," id. at 50 (citation and footnote omitted). As detailed above, the defendant's conduct and the circumstances of his offense place him among the most dangerous offenders who commit violations of 18 U.S.C. § 2339B(a)(1).

In any event, recent sentences imposed within this district, as well as within the Second Circuit, for individuals who attempt to travel overseas to join a foreign terrorist organization militate against imposition of the lenient sentence requested by the defense. For example, on April 2, 2019, the court in United States v. Adam Raishani, No. 17-CR-421 (RA) (S.D.N.Y.), imposed a sentence of 240 months' imprisonment for Raishani's own foiled attempt to provide material support to ISIS by traveling to ISIS-controlled territory and for his conspiracy with another person to travel to ISIS-controlled territory. Similarly, on May 31, 2017, the court in United States v. Tairod Pugh, 15-CR-116 (NGG) (E.D.N.Y.), sentenced Pugh to a total of 420 months' imprisonment following his conviction at trial for attempting to travel to ISIS-controlled territory to join ISIS and for destroying electronic media in an effort to obstruct any investigation of his crime.

Notably the defendant's conduct in this case shares features of both the Raishani and Pugh cases, with exceptions that make his conduct comparatively more serious than the attempts at issue in those cases. Like Raishani and Pugh, the defendant himself attempted to travel to ISIS-controlled territory, but unlike either of them, the defendant actually made his way into a war zone. Both Raishani and Pugh were arrested or turned back at airports before they could make their way to conflict areas, whereas the defendant was able to enter into contested areas and made repeated efforts despite the risk of serious harm to enter into ISIS-controlled territory. Similarly to Raishani, the defendant also encouraged others to join ISIS

13

and counseled the CHS regarding how to get to ISIS-controlled territory.  Similarly to Pugh, the defendant obstructed law enforcement's efforts to investigate his crimes by advising the Individual to delete their messages and by telling the CHS to conceal his identity online.  Unlike Pugh, however, the defendant's plea agreement provided him coverage from any additional criminal charges for obstruction of justice.

The sentence of 240 months' imprisonment recommended by the Guidelines and by the Probation Department is consistent with other sentences imposed for similar offenses committed by similarly situated defendants. As noted above, courts in this Circuit (and around the country) have correctly severely sanctioned similarly situated individuals who, like the defendant, seek to travel to foreign lands to join terrorist organizations.  Contrary to assertions by the defense, such crimes are extraordinarily grave, in light of acts of wanton destruction perpetrated by such organizations through the hands of foreign fighters – the role to which the defendant aspired.

C.      A Guidelines Sentence Is Necessary To Afford Adequate Deterrence and To Promote Respect for the Law

A Guidelines sentence is also necessary in order to adequately deter criminal conduct—in this case, terrorism aimed at harming Americans and American interests—and to promote the law prohibiting such destructive conduct. See 18 U.S.C. § 3553(a)(2)(A)-(B). As Judge Walker stated in his concurrence in Stewart, "[i]n no area can the need for adequate deterrence be greater  than in terrorism cases, with their potential for devastating loss of innocent life." Stewart, 590 F.3d at 181.

The capacity of a terrorist organization like ISIS to thrive hinges in large part on its ability to grow its membership—to attract, indoctrinate, and enlist new followers, like the defendant, who are committed to advancing and serving ISIS's murderous agenda or die trying.  It is only through this support that ISIS and other terrorist groups are able to fulfill their missions of hate, murder, and violence.  Deterring such conduct is particularly important in today's environment, when so many young people in the West, including in the United States, have become radicalized by jihadist propaganda online and have either traveled or tried to travel to the Middle East to join ISIS and other terrorist groups.  It is vital for our country's national security that other young men and women who reside in the United States, when exposed to hateful extremist teaching, be deterred from choosing to follow a path similar to the defendant and engaging in potentially devastating conduct in support of such groups.  It is important for those contemplating joining a terrorist organization to know that the consequences for such conduct are serious.  And it is important for the public to know that those who seek to join and support terrorist organizations will face serious punishment preventing them from causing harm to society.  A Guidelines sentence is necessary and warranted in this case to serve the pressing need for general deterrence of such terrorism offenses.

14

IV.     Conclusion

        For all these reasons, the government joins the Probation Department in respectfully requesting that the Court sentence the defendant to a Guidelines sentence of 240 months' imprisonment, a sentence sufficient but not greater than necessary to provide just punishment, promote respect for the law, protect the public from further crimes of the defendant and provide adequate deterrence to others contemplating similar acts.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:     /s/ Ian C. Richardson
         Ian C. Richardson
         Assistant U.S. Attorney
         (718) 254-6299

cc:     Clerk of Court (FB) (by ECF)
       Susan G. Kellman, Esq. and Gary S. Villanueva, Esq. (by ECF)
       Jaime L. Turton, Senior United States Probation Officer (by Email)